# United States Court of Appeals
## For the First Circuit

Nos. 15-1194 & 15-1838

UNITED STATES OF AMERICA,

Appellee,

v.

JOSHUA GONSALVES; STANLEY GONSALVES,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, Chief U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Larry J. Ritchie for appellant Joshua Gonsalves.
Joshua L. Gordon, with whom Law Office of Joshua L. Gordon was on brief, for appellant Stanley Gonsalves.
Randall Ernest Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 7, 2017

**THOMPSON**, **Circuit Judge**.  Brothers Stanley and Joshua Gonsalves (to keep the Gonsalveses straight, we call them Stanley and Joshua but mean no disrespect) were convicted on multiple counts stemming from their operation of an oxycodone-trafficking ring on Cape Cod.  Both now challenge their convictions, and Stanley challenges his sentence.  Finding none of the brothers' plaints have merit, we affirm.

## SETTING THE STAGE

The Gonsalves brothers' trial spanned eighteen days and included testimony from thirty-four witnesses.  We decline to recount it all now (and to explain the brothers' claims on appeal, we don't have to).  But to put everything in its necessary context, here is the Cliff's-Notes version of what happened; we will detail the rest later, when we assess the brothers' respective arguments.[1]

---

[1]  Both brothers claim the evidence against them was insufficient for the jury to convict, and Joshua challenges the district court's denial of his motion to suppress evidence seized during a warrantless search of his car.  On these claims we present the relevant facts "in the light most flattering to the government."  United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014); see United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015).  As to the other claims, the question of how we relate the facts is unsettled in this circuit--some cases relate them in the light most favorable to the verdict, but others take a "balanced" and objective approach.  Burgos-Montes, 786 F.3d at 99.  Though our framing of those facts does not impact the outcome of the case, favorably to the Gonsalves brothers we explain the facts relevant to their other claims in a balanced manner.

## I. The Cast and Crew of the Conspiracy

The story of the Gonsalves brothers' drug-trafficking conspiracy begins around the end of 2009, when Stanley (Joshua wasn't on board yet) started buying oxycodone pills in bulk from Florida resident John Willis.  Stanley's objective:  to get (and resell for profit) as many pills as possible.  Here's how the operation worked:  both Stanley and Willis paid runners who carried money down to Florida to buy oxycodone pills from Willis, Stanley's primary supplier.  Willis (or other members of his Florida operation) hid the pills in vitamin bottles, doctored to look never-opened, then gave the bottles to the runners to carry back to Stanley in Massachusetts.  Stanley (and members of his Massachusetts-based crew) counted the pills and packaged them into lots of 100.  Stanley then sold those lots to lower-level drug dealers.  At first, Stanley paid Willis $14 per thirty-milligram pill and sold them to dealers for $19 each.  Over time, the wholesale and the resale prices went up to $17 and $21, respectively.  Dealers sold the pills on the street for $30 a pop.

Joshua joined his brother's conspiracy in 2010, shortly after he was released from jail on an unrelated charge.  At first Joshua worked as a runner, but he eventually took over some of Stanley's responsibilities in the conspiracy, such as buying pills from suppliers.  He sold some pills on his own, too.

The runners for the Gonsalves brothers--all friends, family, girlfriends, and exes--made regular trips to Florida. At first, they flew. Then they switched to driving after one of the runners was busted in the airport on his way back to Massachusetts carrying a bottle of about 8,000 pills. The runners each transported at least 1,000 pills per trip, though some reported as many as 8,000 or 9,000 per trip, and one reported that she once carried almost 20,000 pills. The brothers' operation "flooded" the Cape Cod market, bringing in an estimated 371,327 pills in under three years (and that's an allegedly conservative estimate).

## II. Johnny Willis meets Johnny Law--and so do the Gonsalves Brothers

Now, (presumably) unbeknownst to Stanley and Joshua, Willis was the subject of a multi-agency criminal investigation originally initiated by the FBI's Asian Organized Crime Task Force to target two other, Boston-area crime lords. (The Willis-specific branch of the investigation was known as "Operation White Devil.") While they were looking into the Willis operation, the FBI-led task force (that also included ATF and IRS[2] agents, Massachusetts State Police, plus some Boston police officers to boot) found out about Willis' top customers--the Gonsalves brothers. The FBI-led task force also learned that the Barnstable Police Department and

_____

[2] Respectively, these stand for the Federal Bureau of Investigation; the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the Internal Revenue Service.

a DEA-led Cape Cod Drug Task Force were already looking into the Gonsalveses' activities, so the task forces joined forces. Operation White Devil culminated in the May 2011 arrest of Willis and some of his henchmen, which turned off the Florida-to-Massachusetts pill faucet. Undeterred, the Gonsalves brothers regrouped and started selling oxycodone bought from new suppliers. But, the post-Willis era did not last long because by this point, law enforcement had new information from arrested Willis crew members, as well as from their own posse of confidential informants ("CIs"), clueing them in on more of the particulars of the Gonsalves brothers' illegal dealings.

A tip from one informant, CI-1, led to the February 2012 arrest of Joshua and crew member Katelyn Shaw (Joshua's then-girlfriend) and the seizure of over twenty grand in cash, drug paraphernalia, and a good lot of oxycodone pills. About a month later, police seized another $75,000 from another Gonsalves crew member (turned informant) which had been earmarked for an oxycodone resupply; and since that was "the end of the money," the seizure brought the Gonsalveses' operation to a near-halt.

On November 1, 2012, a grand jury indicted the brothers on a charge of Conspiracy to Possess with Intent to Distribute and Conspiracy to Distribute Oxycodone in violation of 21 U.S.C. § 846. A second superseding indictment, issued eighteen months later on May 8, 2014, further charged (1) Money Laundering Conspiracy in

violation of 18 U.S.C. § 1956(h); (2) multiple counts of Concealment Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (3) Possession of a Firearm in Furtherance of a Drug Trafficking Conspiracy in violation of 18 U.S.C. § 924(c); (4) Drug and Money Laundering Forfeiture allegations under 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1); and, against Stanley only, (5) Unlawful Monetary Transactions in violation of 18 U.S.C. § 1957.

### III. Court Proceedings

In pretrial proceedings, Joshua moved to suppress all items seized during the February 2012 traffic stop. The district court denied the motion. For its part, the government moved in limine to admit evidence of the brothers' prior incarceration. That motion got denied, too. The Gonsalveses' trial finally got underway on September 8, 2014. Here are some of the highlights of the proceeding that animate the brothers' appellant challenges. During the trial, Joshua moved for a mistrial three times after government witnesses mentioned that he had done prison time-- testimony which violated the trial court's pre-trial ruling excluding any mention of either brother's prior incarceration. Stanley made his own mistrial motion after the government referenced Stanley's stint in the slammer in closing arguments. All four motions were denied.

Strategically, the brothers mounted a credibility defense throughout the trial and in their closing arguments. They contended that the government's witnesses could not be believed because some were addicted to drugs, some were "jilted" lovers who wanted revenge, and many had taken the stand in exchange for lesser sentences or deferred prosecution for their own roles in the conspiracy. Despite these credibility challenges, both brothers were found guilty on all of the charges except the § 924(c) count-- Stanley was convicted of using a rifle in furtherance of the conspiracy but acquitted of using a pistol, and Joshua was acquitted as to both guns.

Guilt determined, the proceedings entered phase two-- forfeiture. Responding to additional instructions from the trial court, the jury found that two cars, a house, and the drug-deal cash seized from Joshua and Shaw were all subject to forfeiture. The jury also calculated that over five million dollars was "generated as proceeds of the [brothers'] oxycodone trafficking conspiracy"-- attributing 1.5 million to Joshua and the rest to Stanley.

Following the trial's end, Joshua was first up for sentencing and received twenty years to serve. (He does not challenge his sentence here, so we do not get into the details.) Stanley was next up. His pre-sentence investigation report ("PSR") calculated a Guidelines sentencing range of life in prison, plus

sixty months for his gun conviction under 18 U.S.C. § 924(c).  The parties and the judge, in the end, agreed that life wasn't called for, so Stanley was sentenced to twenty-five years--twenty years for the drug-trafficking conspiracy, money laundering, and unlawful monetary transactions, plus five years for the gun charge. This appeal followed.

## DISCUSSION

The brothers challenge the following aspects of their convictions and sentences:  (1) Joshua argues that the district court should have suppressed the evidence seized the night of his February 2012 arrest, (2) both brothers challenge the district court's denial of their motions for mistrial, (3) Stanley contends that the government presented insufficient evidence against him to support his conviction, and (4) Stanley argues that the court incorrectly calculated his Guidelines sentencing range.  We address each issue in turn.

## I. Warrantless Car Search

Joshua contends that the district court erred in denying his motion to suppress all of the evidence seized the night of his February 2012 arrest (the drugs, the money, and the digital scale). We begin with the background information necessary to explain that night's events, presenting the facts in the light most favorable to the government.  See Burgos-Montes, 786 F.3d at 99.

**a) Background**

As we briefly mentioned before, on February 27, 2012, police acted on a tip they received from CI-1. The informant who provided the information leading to the arrest of Joshua and Shaw and the seizure of illegal contraband claimed to be a regular enough oxycodone buyer that he or she knew when Joshua and Shaw's supply was running low--and when they planned to restock. CI-1 had proved his or her bona fides over time:[3]

- In October 2011, CI-1 told police that Gonsalves associate John Doe 1 had planned an off-Cape resupply run. Police observed John Doe 1 meet with John Doe 2 (whom CI-1 had also previously identified as a Gonsalves associate). Police followed the two men on their drive off the Cape and back, as predicted. CI-1 then confirmed the new supply had been delivered.

- In November 2011, CI-1 told police about another off-Cape trip to buy oxycodone from a supplier; after watching the two men identified by CI-1 drive off together, police pulled them over and seized $69,000.

- In February 2012, CI-1 made a controlled buy from Joshua and Shaw.

CI-1's hottest tip came on February 27, when CI-1 told police that Joshua and Shaw had put together enough money to buy more pills from an oxycodone supplier police referred to as "John

---

[3] We also note here that by the time CI-1 appeared on the scene in 2011, the FBI-led task force investigating Willis had already combined resources with the DEA-led task force and Barnstable police. So on top of their newly-cultivated source, the agents and officers investigating Joshua knew the brothers were trafficking oxycodone from evidence gathered during the Willis investigation, including wiretapped conversations and text messages from Willis' phone seized after his May 2011 arrest.

Doe 4."  Both CI-1 and a second CI had previously told police that John Doe 4 was Joshua's primary post-Willis oxycodone source.  CI-1 said Joshua and Shaw would leave home around 4:30 that afternoon in Joshua's black Cadillac, drive to the "New Bedford area," and return with about 2,000 pills.  Sure enough, Barnstable police spotted Joshua, Shaw, and a second woman (who turned out to be Shaw's friend Ariana Tavares) in the black Cadillac heading westbound (towards New Bedford) at 4:50.  Police tailed them to a house in Acushnet, a town that shares a border with New Bedford.  They watched the trio park next to a white Infiniti, exit the car, and enter the house where the Infiniti was parked.  Police knew from pulling over that same white Infiniti one month prior that the car belonged to John Doe 4.

When Joshua, Shaw, and Tavares left some two hours later, police tailed them to the highway, clocked Joshua driving sixty-five miles-per-hour in a fifty-five mile-per-hour zone, and pulled him over.  When the officer who conducted the stop reported back to headquarters, he was instructed to ask Joshua for permission to search the car.  But if Joshua refused, the officer was instructed to search the car anyway because the police had probable cause to believe "the occupants of the vehicle were in possession of oxycodone."  Joshua did refuse, so police ordered him, Shaw, and Tavares out of the car.  During a frisk of Joshua, police found a $6,253 cash wad in his pocket.  It was too dark outside to search

the car, so police called for a drug-sniffing dog. Overhearing the talk about the arrival of a drug dog, Shaw pulled a bag of pills from her bra and threw them into the woods. Seeing the toss, police recovered the pills, precipitating the arrests of the three occupants. In a post-arrest search, police found another $16,760 in a speaker box in the trunk, a digital scale in the console, and a second cache of pills in Shaw's bra.

Joshua subsequently moved to suppress the evidence seized during the search, claiming that the stop and search violated his Fourth Amendment rights because at the time of the stop, police did not have reasonable suspicion to believe Joshua had committed a crime. The district court held a pre-trial hearing on Joshua's motion. Mark Butler, a Barnstable police detective then serving on the DEA's Cape Cod Drug Task Force and investigating the Gonsalves brothers, submitted an affidavit about the Gonsalves investigation and the traffic stop and he also testified at the hearing. Butler was not present at the stop and search, but he explained the state of law enforcement's Gonsalves investigation and his belief that police had probable cause to search Joshua's car at the time based on CI-1's information. After the hearing, the court denied Joshua's motion. The court found that CI-1's tip gave police reasonable suspicion that Joshua was involved in drug trafficking, and that reasonable suspicion justified the stop, Joshua's frisk, and detaining the car and its

occupants until the drug-sniffing dog could arrive. United States v. Gonsalves, 34 F. Supp. 3d 196, 200-01 (D. Mass. 2014). When police saw Shaw discard the drugs, officers had probable cause to arrest Joshua, Shaw, and Tavares. Id. at 201. Police were entitled to search the Cadillac incident to those arrests. Id.

On appeal, Joshua argues that the district court got it wrong. His theory goes like this: police had no right to ask him to get out of the car to begin with (the officer told Joshua he was stopped for speeding) or to detain him at the scene to wait for a drug-sniffing dog, and if they hadn't done these things Shaw never would have tossed the pills, and if she hadn't tossed the pills police wouldn't have had cause to search the car or arrest them. The government argues that the police had probable cause based on CI-1's tip to stop the car and search its occupants, so everything that followed was fair game. But even if not, the government argues that the district court was right to find that police had reasonable suspicion to stop the car, and that suspicion ripened into probable cause to arrest everyone and search the car when Shaw pitched the drugs.

### b) Probable Cause Analysis

We review a district court's denial of a motion to suppress de novo, we review subsidiary findings of facts for clear error, and we must uphold a denial of a suppression motion if any reasonable view of the record supports it. United States v.

Polanco, 634 F.3d 39, 41-42 (1st Cir. 2011). Under this rubric we can likewise affirm a denial on any basis apparent in the record. United States v. Sanchez, 612 F.3d 1, 4 (1st Cir. 2010). We agree with the government that the officers had probable cause to stop Joshua and search the car, and so we affirm the district court's denial of his motion to suppress.

The Fourth Amendment ordinarily requires police to obtain a warrant before conducting a search, but under the so-called "automobile exception," all the police need is probable cause to search the vehicle. California v. Acevedo, 500 U.S. 565, 580 (1991); accord United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). "[P]robable cause only 'exists when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in [the vehicle].'" United States v. Ramírez-Rivera, 800 F.3d 1, 27 (1st Cir. 2015) (quoting United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013)), cert. denied, 136 S. Ct. 908 (2016), and cert. denied sub nom. Laureano-Salgado v. United States, 136 S. Ct. 917, (2016). "The government bears the burden of proving the lawfulness of the search." Lopez, 380 F.3d at 543.

Where, as here, the police act on information from a confidential informant, "law enforcement must provide some information from which a court can credit the informant's credibility." United States v. White, 804 F.3d 132, 136 (1st Cir.

- 13 -

2015) (quoting Ramírez-Rivera, 800 F.3d at 27-28), cert. denied, 136 S. Ct. 1229 (2016).  In assessing an informant's credibility, we consider factors such as "(1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information."  Id. at 137.

Applying those factors, CI-1 had a track record of supplying reliable information to police--as we noted earlier, three times before the February 2012 search CI-1 had proven reliable.  Accordingly, when CI-1 tipped police off to Joshua and Shaw's planned trip to the New Bedford area about three weeks later, this track record gave police reason to believe CI-1's newest tip was probably reliable, too.  See United States v. Tiem Trinh, 665 F.3d 1, 10-11 (1st Cir. 2011); Ramírez-Rivera, 800 F.3d at 28 (police history with informant can establish credibility).[4]

---

[4] Joshua suggests that the three-week time period that passed after CI-1's last confirmed tip made the tip at issue here somehow unreliable, or otherwise tarnished CI-1's record of reliability. But he does not explain why that is so--and in light of the steps we explain below that police took to confirm the tip before acting on it, we do not think it is.

Further, notwithstanding Joshua's unsubstantiated claim to the contrary, the record shows that CI-1 had first-hand knowledge of Joshua and Shaw's operation that bolstered CI-1's credibility. Specifically, CI-1 admitted to buying oxycodone from Joshua and Shaw many times, so the CI knew when their supply was low and when they needed to restock. See White, 804 F.3d at 137 (past drug purchases from tip subject are first-hand knowledge of drug operations that bolster credibility).

Moreover, the tip included details of Joshua and Shaw's future activities "ordinarily not easily predicted," and almost all of these details were corroborated by police surveillance before Joshua's car was stopped. Ramírez-Rivera, 800 F.3d at 29 (quoting Alabama v. White, 496 U.S. 325, 332 (1990)). Police spotted Joshua's Cadillac (the vehicle identified by CI-1) on the highway heading out of town at 4:50 pm (shortly after CI-1 said Joshua and Shaw planned to leave) and followed it to a house in Acushnet (CI-1 said they would be driving to the New Bedford area, and Acushnet abuts New Bedford). The Cadillac parked next to a white Infiniti that belonged to John Doe 4 (the dealer identified by CI-1). After the Cadillac parked, Joshua and Shaw got out of the car (CI-1 said the two of them were making the trip).

Finally, police assessed and understood the significance of CI-1's information before making the stop. Police had independent knowledge of the brothers' prior drug-trafficking

activity through the Willis investigation--including information from two Willis couriers caught bringing pills from Florida up to Massachusetts for the Gonsalves brothers. See United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) (officer's "knowledge of the target's prior criminal activity or record . . . is material to the probable cause determination"). Furthermore, sources other than CI-1 developed during and after the Willis investigation told police that Joshua and Stanley were continuing to sell oxycodone sourced from other suppliers after Willis' arrest. If more were needed, the task force officer leading the Gonsalves investigation (and who told the officer who stopped Joshua that police already had probable cause) had specialized training and experience in drug investigations. See id. (officer's "experience and pertinent expertise" in drug-crime investigations bolstered probable cause finding). In short, law enforcement assessed CI-1's tip in the context of the overall Willis and Gonsalves investigations and in light of their expertise.

But hold on. Before we find probable cause, Joshua says, we must consider indicia of an informant's unreliability, too-- and Joshua thinks that CI-1's tip was so inaccurate that it could not support a finding of probable cause. See United States v. Vigeant, 176 F.3d 565, 573 n.9 (1st Cir. 1999). Specifically, Joshua points out that (1) he drove to Acushnet, but CI-1 said he was headed to New Bedford; (2) CI-1 didn't mention that Shaw's

- 16 -

friend would be with Joshua and Shaw; and (3) police only found 280 pills, not the promised 2,000. But none of these facts undermine our belief that police had probable cause to stop and search the car that night. First, although the task force officer's affidavit said Joshua was going to New Bedford, the officer testified at the suppression hearing that the CI said Joshua was going to the "New Bedford area," and the district court's findings of fact listed the destination as the "New Bedford area." Gonsalves, 34 F. Supp. 3d at 199. Joshua does not challenge that finding of fact as clearly erroneous on appeal, so we adopt it here. See Polanco, 634 F.3d at 41-42. Acushnet and New Bedford are adjoining towns, so CI-1's claim that Joshua was heading to the "New Bedford area" was accurate. The same goes for his second point--that CI-1 didn't tell police that Tavares would be along for the ride--because the omission of the fact does not make CI-1's tip inaccurate as to the presence of Joshua and Shaw. But even if it did, we assess probable cause under the totality of the circumstances, White, 804 F.3d at 136, and given the other factors we described above, this point does little to undermine the government's probable-cause argument or our probable-cause finding. Joshua's third argument--that Shaw was only carrying a fraction of the drugs that CI-1 predicted--doesn't help his case, either. We measure probable cause at the time the officers effectuate the search. See Lopez, 380 F.3d at 543. That means

- 17 -

the mid-search discovery of a smaller-than-anticipated pill stash does not change whether the officers had probable cause to begin with.

All things considered, we find the police had probable cause to stop Joshua and search his car.  We affirm the district court's order denying Joshua's motion to suppress the evidence found during the search.[5]

## II. Motions for Mistrial

Next, Joshua and Stanley claim that the district court abused its discretion in denying their motions for a mistrial. Once again, we present some relevant context before we explain the arguments and our analysis; but this time, we present the facts in a balanced manner.  Burgos-Montes, 786 F.3d at 99.

### a)  Background

Before trial began, the government filed motions in limine to introduce evidence that Stanley and Joshua were

---

[5] He also says that the testimony of Katelyn Shaw should be suppressed, the theory being:  (1) police detained Joshua and Shaw longer than necessary to dispel the reasonable suspicion police had to pull them over to begin with (if they even had reasonable suspicion), and (2) it was only because of this unlawfully-long detention that Shaw lobbed her drugs and was eventually forced to testify, so (3) her testimony is the fruit of her unlawful detention.  The government points out that Joshua did not raise this argument to the district court, so it argues that the issue is waived.  We agree.  See United States v. Santos Batista, 239 F.3d 16, 19 (1st Cir. 2001) ("Failure to raise suppression arguments before trial 'shall constitute waiver thereof.'" (quoting Fed. R. Crim. P. 12(f))).

previously incarcerated.  Before going into business with Willis, the brothers were part of a burglary crew that got caught; the government hoped to show that the Gonsalveses and those crew members enlisted their girlfriends and wives to sell oxycodone on their behalf while they were in jail.  The government also wanted to prove that Stanley and Willis were incarcerated together, arguing that this fact was "intrinsic" to the conspiracy--the idea being that the two trusted each other enough to strike their illicit deal when Stanley got out of jail in 2009 because they were simpatico in jail together.  The Gonsalveses, of course, wanted to keep out any mention of past jail time, and pointed out that Federal Rule of Evidence 404(b)(1) prohibits the use of evidence of past crimes to show propensity (meaning that if they did it once, they probably did it again).  Before trial began, the district court ruled that witnesses could "talk about their prior relationships with the defendants" in order to show the "basis for the coconspirators' relationship of mutual trust."  But, the judge said, "I am categorically prohibiting the government in any way from referring to any prior period of incarceration" as to either defendant.  And yet, it came up four times.

The first mention came on the fifth day of trial from Danielle LeBaron, who testified that she "transported drugs" for Stanley.  When the government asked LeBaron about a conversation she had with Joshua about oxycodone, she said "[i]t was a

- 19 -

conversation about Josh making money, since he just got out of jail." Joshua objected and the government moved to strike, explaining that LeBaron's response "was not intended." The court immediately struck the testimony and told the jury: "[y]ou can't consider anything having to do with that." At a later sidebar conference away from the jury's earshot, Joshua moved for a mistrial. The government pointed out it had instructed LeBaron "repeatedly" not to bring up Joshua's prior jail time. The court denied Joshua's motion, but offered to give an additional jury instruction. Joshua turned down the offer, explaining that "if you call attention to it, it's going to compound the circumstances." The court later confirmed with LeBaron that the government had instructed her not to mention Joshua's prior incarceration, and admonished her not to mention it in her second day of testimony.

The second jail allusion came on the ninth day of trial, when the Gonsalveses' sister, Nichole Gonsalves, was testifying about the purchase of Joshua's Cadillac. Nichole said she used the car to drive Joshua to "appointments"; when asked what those appointments were she replied, "probation." The district court judge "thought [Nichole] was referring to the cousin," not Joshua, and clarified "This is someone else completely, right, a cousin?" before granting the government's motion to strike the question. Joshua renewed his mistrial motion; the court denied it.

Third, on day ten, Crystal Flaherty (a cooperating ex-girlfriend) was asked what Joshua said to her about his oxycodone trafficking. Flaherty responded, "He said that he was working for Stanley. He was the driver; this is what he needed to do. He was a--he had a broken hip. He was a convicted felon." The court struck the answer as "inappropriate," then instructed the jury to disregard any stricken testimony, and specifically Flaherty's last answer, because it was "completely irrelevant" to the case. Joshua again moved for a mistrial. At sidebar, the government confirmed that it had instructed Flaherty not to discuss Joshua's prior incarceration. The court reserved judgment on Joshua's motion for a mistrial, explaining: "this is one of the most overwhelming government cases I've seen in a long time. I haven't heard [the Gonsalveses'] side of the story yet, but I am just not sure it's been prejudicial."[6]

Finally, in closing the prosecutor described a recorded call between Stanley and Vincent Alberico (a witness who testified that he resold pills he bought from Stanley, and who was arrested while transporting some pills for Stanley). The prosecutor explained, "Vinnie is still in jail, Stanley is out of jail, and Stanley is"--before he was cut off by Stanley's objection and the court's instruction that the prosecutor "misspoke." The

_____

[6] Apparently, the district court judge did not give a final ruling on this motion, nor was she asked to do so.

- 21 -

prosecutor, rephrasing, continued saying, "[Stanley] is out in the community back on the Cape," before noting that Stanley bragged to Alberico about how women wanted to "marry" him for just "one little blue pill." The district court denied Stanley's later motion for a mistrial based on the statement that he was "out of jail." In its instructions to the jury, the court explained, "closing arguments made by the lawyers are not evidence," and emphasized that "[y]ou can't consider anything that I struck."

On appeal, the brothers separately argue that the district court abused its discretion by denying their motions for mistrial. Joshua argues that the three witness statements are improper propensity evidence: they invite the jury to convict based on the fact that he committed crimes in the past, not on the evidence presented at trial, so the mentions of his prior incarcerations interfered with his presumption of innocence. The prosecutor's closing remark that Stanley was "out of jail" was the "icing on the government's cake"--it drove home the message that the Gonsalves brothers were criminals. The prejudice resulting from these remarks as a whole requires a mistrial, Joshua contends.

Stanley claims the witnesses' three remarks about Joshua's prior incarcerations had a "spillover" effect on him, and that the prosecutor's closing remark was Stanley's own ticket to a mistrial. The government argues that any potential prejudice to

Joshua and Stanley was mitigated by the district court's prompt jury instructions, so a mistrial was not called for.

### b) Mistrial Analysis

We review a district court's denial of a motion for a mistrial for abuse of discretion. United States v. Trinidad-Acosta, 773 F.3d 298, 306 (1st Cir. 2014) (improper testimony); United States v. Gentles, 619 F.3d 75, 80-81 (1st Cir. 2010) (prosecutor's misconduct in closing arguments). First we consider whether the remarks were improper--that is, whether the challenged testimony was inadmissible, or the prosecutor's remark rose to the level of misconduct. See Trinidad-Acosta, 773 F.3d at 306; United States v. Vázquez-Botet, 532 F.3d 37, 56 (1st Cir. 2008); United States v. Cresta, 825 F.2d 538, 549 (1st Cir. 1987). Second, if the remarks are improper, "we consider the totality of the circumstances to determine whether the defendant has demonstrated the kind of clear prejudice [from improper remarks] that would render the court's denial of his motion for a mistrial a manifest abuse of discretion." Trinidad-Acosta, 773 F.3d at 306 (quoting United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009)). Those circumstances include "the context of the improper remark, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants." Id. at 306-07 (quoting Cresta, 825 F.2d at 549-50); see Gentles, 619 F.3d at 81. A mistrial is a "last resort"

implemented only where the "taint" of the improper evidence is "ineradicable" and the jury's exposure to it "beyond realistic hope of repair." Trinidad-Acosta, 773 F.3d at 306; see Cresta, 825 F.2d at 550 (mistrial only appropriate where statement likely to have affected the jury verdict).

Assessing the witnesses' remarks about Joshua, and then the prosecutor's statement about Stanley under this standard, we find that the district court did not abuse its discretion in denying Joshua's and Stanley's motions.

### i) Witness Statements

As to the appropriateness of the comments about Joshua, the witness testimony about his prior incarceration in the context of these trial proceedings was likely improper. "It is axiomatic that the prosecution cannot introduce evidence of defendant's bad character or previous criminal activity to prove defendant's propensity to commit the crime charged." United States v. Sclamo, 578 F.2d 888, 890 (1st Cir. 1978); see also Cresta, 825 F.2d at 549. Yet considering the remarks under the totality of the circumstances, we do not believe the remarks were likely so prejudicial as to have affected the verdict.

For one thing, the remarks were fleeting and unaccompanied by any details about Joshua's past crimes or prison terms. See Trinidad-Acosta, 773 F.3d at 307 ("[F]leeting references [to the defendant's incarceration] are generally

allowed, but extended comment is impermissible.") (citation omitted); United States v. De Jesus Mateo, 373 F.3d 70, 73 (1st Cir. 2004) (brief mention of past incarceration "with little detail" did not warrant mistrial).  Indeed, Nichole's statement may not have registered with the jury at all:  the district court thought Nichole said she drove Joshua's cousin to probation appointments, not Joshua himself.  Although the other two statements were not so ambiguous--LeBaron said Joshua had just gotten out of jail, and Flaherty said Joshua was a felon--these statements were brief and devoid of detail.

Further, Joshua's claims notwithstanding, nothing in the record indicates that the remarks were made deliberately.  See Cresta, 825 F.2d at 550.  In each instance, the prosecution's questioning was proceeding along legitimate--and otherwise relevant--lines, unrelated to the prior prison terms.  The questions posed could naturally have been answered without any reference to Joshua's time in jail.  The record also shows that the district court judge questioned LeBaron herself to confirm that the prosecution had followed the judge's instruction and warned LeBaron against mentioning Joshua's jail time.

Additionally, as the government points out, the district court issued a prompt curative instruction with each witness's slip-up.  We see no reason to believe that the district court's curative instructions were not effective.  "'[W]ithin wide

margins, the potential for prejudice . . . can be satisfactorily dispelled by appropriate curative instructions.'   Jurors are presumed to follow such instructions, except in extreme cases." United States v. Freeman, 208 F.3d 332, 345 (1st Cir. 2000) (quoting United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993)) (internal citation omitted).   Indeed, whenever "a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice." United States v. Van Anh, 523 F.3d 43, 54 (1st Cir. 2008) (quoting United States v. Reiner, 500 F.3d 10, 16 (1st Cir. 2007)).   Given the content and context of the remarks, the witnesses' remarks do not represent the "extreme case" that would make Joshua and Stanley's case the exception to the rule.

Finally, we note that the evidence against Joshua and Stanley was, as the district judge put it, "overwhelming."   The allegedly mistrial-worthy witness statements were dropped mid-stream in explanations of significantly more salacious details about the brothers' drug trafficking.   LeBaron mentioned that Joshua was freshly out of jail just before she explained her own role as a courier for Stanley, flying pills from Florida to Boston, and distributing pills and picking up money all over Cape Cod. Nichole made her reference to Joshua's probation while describing how she helped her brother use cash to buy a Cadillac registered in her name (relevant to Joshua's charge of concealment money

- 26 -

laundering). Flaherty, too, mentioned that Joshua was a "convicted felon" immediately before launching into a description of Joshua and Stanley's oxycodone-trafficking business.

Considering these factors under the totality of the circumstances, Joshua has not demonstrated such "clear prejudice" from the improper witness testimony that the district court's denial of his mistrial motions was a "manifest abuse of discretion." Trinidad-Acosta, 773 F.3d at 306.

That finding means that Stanley--who was not directly implicated by any of the remarks--hasn't, either. We turn next to the prosecutor's statement in his closing argument to see what, if anything, it adds to Joshua's argument, and whether the district court abused its discretion in denying Stanley's motion.

### ii) Closing Argument

As a reminder, we check to see whether a prosecutor's remark rose to the level of prosecutorial misconduct before assessing the prejudice caused by the remark under the totality of the circumstances. Vázquez-Botet, 532 F.3d at 56. Even though the defendants' briefs are silent on the point, we assume for the sake of argument that the Stanley-is-out-of-jail statement amounts to misconduct.

But considering the prejudice caused by the remark under the totality of the circumstances, it did not "so poison[] the well that the trial's outcome was likely affected, thus warranting

a new trial." Gentles, 619 F.3d at 81 (quoting United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007)). The comment was isolated, and we see no indication that it was made deliberately. Indeed, the prosecutor himself immediately attempted to clarify his point by saying that Stanley was "in the community." The district court quickly struck the offending remark, and later when instructing the jury, cautioned them that the closing remarks were not evidence and that the jury could not consider anything the judge had stricken. Finally, as we explained above, the evidence against both brothers was extremely strong, so we do not believe any remaining prejudice could have influenced the jury's verdict.

Under these circumstances, the district court did not abuse its discretion in denying Stanley's motion for a mistrial. Moreover, in light of the isolated nature of the prosecutor's comment (which had nothing to do with Joshua) and the judge's curative instructions, we do not think the prosecutor's comment adds enough to Joshua's mistrial argument to shift the balance (if indeed it adds anything at all). The district court did not abuse its discretion in denying the brothers' motions.

### III. Sufficiency of the Evidence against Stanley

Stanley argues that he should have been acquitted--of everything, and of the gun charge at a bare minimum--because the government did not present enough evidence for the jury to convict him. First, we explain the few facts necessary to understand his

arguments in the light most favorable to the verdict, <u>Rodríguez-Soler</u>, 773 F.3d at 289-290, followed by the arguments and our take.

### a) Background

As we mentioned earlier, the charges against Stanley included possession of a firearm in furtherance of a drug-trafficking conspiracy in violation of 18 U.S.C. § 924(c)--specifically, a rifle. At trial, two witnesses testified that Stanley possessed that rifle:

- Alexa Doran--one of Stanley's exes and the mother of one of his children--testified that Stanley bought a "big gun, like a rifle or something" in a large case from a friend and stored it behind the couch for a few weeks. During that time, she was working for Stanley and counting money and distributing pills in the apartment where the gun was kept.

- Matthew Hernon--Doran's brother, who started working for Stanley when he was fifteen or sixteen and chauffeured Stanley to drug deals while still on his learner's permit--testified that in 2011, he saw an AR-15, the "public model of the M16" assault rifle, in Stanley's house. Stanley pulled a case out from behind the couch, took the gun out of the case, cocked the gun, and pointed it at Hernon from one or two feet away. Afterwards Stanely wiped his fingerprints off the gun and put it back in the case. Stanley told Hernon he was afraid someone was going to rob him, so he had the gun for protection.

In his opening and closing arguments, and throughout his cross-examination of the government's witnesses, Stanley attacked the witnesses' credibility. Hernon, for instance, wanted an opportunity to get back at Stanley for leaving Doran for another woman while Doran was pregnant with Stanley's child. On top of

being a jilted ex, Doran also had a drug problem while she was working for Stanley and was testifying against him to avoid prosecution for her own part in the conspiracy. (Thirteen of the thirty-six witnesses were alleged co-conspirators subject to this brand of attack.)

At the close of the evidence, Stanley moved for a judgment of acquittal. The district court denied the motion.

Stanley now reprises his two-part insufficient-evidence challenge, contending as he did below that (1) the government presented insufficient evidence on all of the charges because "[a]ll of the witnesses" were proven incredible--all were "impeached" by their animosity for the brothers, criminal past, or the deals they got for testifying; and (2) the government did not present evidence that he possessed a gun in furtherance of a drug-trafficking offense, as it must for the jury to convict him under § 924(c), because "[b]eyond the rifle's existence, there is no evidence it was ever used . . . as part of any transaction." The government disagrees.

### b) Sufficiency Analysis

We review a district court's denial of a motion for judgment of acquittal de novo, considering "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that

the prosecution successfully proved the essential elements of the crime." United States v. George, 841 F.3d 55, 61 (1st Cir. 2016) (quoting United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012)).

### i) Witness Credibility

Stanley's witness-credibility-based sufficiency argument is hopeless. As a general matter, in reviewing the sufficiency of the evidence this court "must defer all credibility judgments to the jury." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994); accord United States v. Sepulveda, 15 F.3d 1161, 1174 n.4 (1st Cir. 1993). "We are not at liberty to question the credibility of witnesses." United States v. Rodríguez-Milían, 820 F.3d 26, 31 (1st Cir. 2016), cert. denied, 137 S. Ct. 138 (2016). As the government points out, Stanley made his credibility arguments to the jury, but the jury found him guilty nonetheless. On appeal, he simply reiterates that the witnesses were incredible, but does not explain how or why his case escapes our credibility rule, so this argument gets him nowhere.

### ii) Gun Charge

Stanley's § 924(c) transactional argument fares no better--a rational factfinder could find Stanley guilty of the § 924(c) charge beyond a reasonable doubt. Contrary to his position on appeal, the government did not have to show that Stanley used the gun in a drug transaction in order to convict.

Instead, it had to show three things, that Stanley (1) possessed a firearm (2) in furtherance of (3) a drug-trafficking crime.  18 U.S.C. § 924(c)(1)(A), (2).

As to the first element, the government presented evidence that Stanley possessed a gun:  Doran and Hernon testified that they saw Stanley handle a rifle he pulled out from behind his couch, and Hernon said Stanley pointed it at him.  See United States v. Carlos Cruz, 352 F.3d 499, 509 (1st Cir. 2003) (testimony that defendant was carrying a gun established element of possession).

As to the second element, the government also presented evidence that Stanley possessed the gun "in furtherance of" his oxycodone-trafficking conspiracy.  A gun is possessed in furtherance of a crime where it is possessed "to advance or promote the commission of the underlying offense."  United States v. Robinson, 473 F.3d 387, 399 (1st Cir. 2007) (quoting United States v. Grace, 367 F.3d 29, 35 (1st Cir. 2004)).  For instance, a gun kept near a drug distribution point for "protection from robbery of drug-sale proceeds . . . may reasonably be considered to be possessed 'in furtherance of' an ongoing drug-trafficking crime."  Carlos Cruz, 352 F.3d at 509 (quoting United States v. Garner, 338 F.3d 78, 81 (1st Cir. 2003)).  That's what the government showed here:  Doran said Stanley kept the gun behind the couch where he distributed oxycodone pills and counted drug money, and Hernon

said he had the rifle for protection in case someone tried to rob him.

As for element three, Stanley was convicted of a drug-trafficking crime--conspiracy to possess with intent to distribute and conspiracy to distribute oxycodone under 18 U.S.C. §§ 841(a)(1) and 846. Aside from his witness-credibility argument, which we have already rejected, Stanley does not otherwise challenge that conviction on appeal. The government presented sufficient evidence for the jury to convict Stanley of possessing the rifle in furtherance of his drug-trafficking conspiracy.[7]

## IV. Stanley's Sentence

That brings us to the last claim on appeal--Stanley's argument that his Guidelines sentencing range was incorrectly calculated and so his sentence is procedurally unreasonable. As before, we begin by recounting the relevant facts in a balanced manner. Burgos-Montes, 786 F.3d at 99.

---

[7] Stanley puzzlingly mentions that the jury was confused about his guilt because it wrote "? Were any guns seized?" on the verdict form. The government doesn't have to introduce the actual gun into evidence to prove a § 924(c) charge--indeed, the jury's note doesn't relate to any element of the offense--so we do not see how this point helps Stanley. In any case, we don't have to parse it out any further because the argument is undeveloped, and undeveloped arguments are waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

### a) Background

Stanley's pre-sentence investigation report ("PSR") calculated Stanley's Guidelines sentencing range as life in prison, plus five years for his conviction under 18 U.S.C. § 924(c). Stanley's criminal history score was twenty, which put him in criminal history category VI. U.S. Sentencing Guidelines Manual ("U.S.S.G.") Ch. 5, pt. A (U.S. Sentencing Comm'n 2014). The PSR calculated his total offense level as forty-six. The only component of that offense-level calculation relevant here is Stanley's base offense level, which is determined by the quantity of drugs attributable to Stanley and involved in the conspiracy. See U.S.S.G. § 2D1.1(a)(5), (c). The sentencing court found Stanley's base offense level was thirty-six, which it calculated by dividing the jury's $3,552,203 forfeiture verdict (Stanley's share of "the total gross proceeds of the oxycodone conspiracy") by $20 per pill (Stanley's average sale price when he sold thirty-milligram oxycodone pills to other dealers), and adding on the pills seized during the conspiracy.

At sentencing, Stanley argued that his base offense level should have been even lower--thirty-four--because the drug-quantity calculation was based on "estimates," and so Stanley's drug quantity could not be established with certainty. But, Stanley's attorney said, "I'm not sure it makes any difference . . . whether he was a 36 to start or a 34, I think the computation

- 34 -

probably is almost irrelevant as we go forward." Indeed, the parties and the court agreed at sentencing "that life is not appropriate here."

In their sentencing arguments, both Stanley and the government stressed how Stanley's role in the conspiracy compared to that of Joshua and Willis--both men were sentenced first, and both got twenty years in prison. When Stanley pointed out, "all of the alleged kingpins," including Willis, "got non-Guideline sentences," the sentencing court interrupted to say that Stanley is "going to get a non-Guideline sentence."

In sentencing Stanley to twenty years, plus five years for the § 924(c) charge, the court explained that Stanley was "the organizer on Cape Cod, on top of, as far as I'm concerned, even [his] brother Josh." The judge stated that Stanley's twenty-five year sentence was "appropriate" and "sufficient but not greater than necessary" to serve a deterrent purpose, considering "the gravity of the offense, giving [Stanley] a proportionate punishment to other people in similar situations in this conspiracy, and also essentially making sure that the deterrence goes out to the community that oxycodone is something that is harmful and that we take seriously." The judge reiterated, "[e]ven if my criminal Guideline sentencing turns out to be incorrect in some [way], this is what I think is sufficient but not greater than necessary to serve the purposes of punishment."

Stanley appeals his sentence, arguing that the district court overestimated the quantity of drugs attributable to him so his base offense level was too high. The government disagrees, and contends that even if the court made some error in assessing Stanley's drug quantity, the error did not affect his substantial rights.

### b) Analysis

Stanley did not object below on the grounds he raises on appeal, so we review his sentencing claim for plain error.[8] That means Stanley must show "(1) that an error occurred (2) which was clear and obvious and which not only (3) affected the [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Rìos-Hernandez, 645 F.3d 456, 462 (1st Cir. 2011); accord United States v. Goodhue, 486 F.3d 52, 55 (1st Cir. 2007). Under this standard, Stanley faces a steep uphill climb, and his arguments are not up to the challenge. As we explain, we agree with the government that even if a clear and obvious error occurred, Stanley's claim still fails because we cannot conclude

---

[8] The parties squabble over whether some of Stanley's fact-specific drug-quantity-calculation arguments are waived. We give him the benefit of the doubt and review them all for plain error. See United States v. Kinsella, 622 F.3d 75, 86 (1st Cir. 2010) (taking an analogous approach).

that the error "affected [Stanley's] substantial rights." Goodhue, 486 F.3d at 55.

On the third prong of plain error review, the defendant must show "a reasonable likelihood 'that, but for the error, the district court would have imposed a different, more favorable sentence.'" United States v. Hudson, 823 F.3d 11, 19 (1st Cir. 2016), cert. denied, 137 S. Ct. 620 (2017) (quoting United States v. Ortiz, 741 F.3d 288, 293-94 (1st Cir. 2014)). Though an incorrectly calculated Guidelines range is, in itself, often enough to meet this burden, the government may counter by demonstrating that "the district court would have imposed the same sentence even without the error." United States v. Reed, 830 F.3d 1, 4 (1st Cir. 2016) (internal quotation marks omitted) (quoting United States v. Tavares, 705 F.3d 4, 25 (1st Cir. 2013)); see United States v. Marchena-Silvestre, 802 F.3d 196, 201 (1st Cir. 2015). "Our approach has been to attempt to discern whether there exists 'a clear statement by the [sentencing] court that would be sufficient to diminish the potential of the [Guideline Sentencing Range] to influence the sentence actually imposed.'" Hudson, 823 F.3d at 19 (quoting Marchena-Silvestre, 802 F.3d at 201). If so, we may affirm the defendant's sentence. Id.

We think the sentencing court made such a "clear statement" here. First, Stanley proposed a lower drug-quantity calculation at sentencing. Aware of his argument, the court

explained that Stanley's alternative Guidelines calculation did not matter because Stanley is "going to get a non-Guideline sentence." Then, instead of basing Stanley's sentence on his Guidelines range, the sentencing judge gave Stanley "a proportionate punishment" to that of his co-conspirators Willis and Joshua. Both of these men were sentenced to twenty years' imprisonment, and Stanley's sentence was the same--plus five years for his § 924(c) conviction (remember Joshua was acquitted of that charge, and as the parties discussed at the sentencing hearing, Willis was never charged under the statute). If more evidence of the sentencing judge's intent to give a non-Guidelines sentence were needed, she explained that even if the Guidelines range "turns out to be incorrect," the sentence was "sufficient but not greater than necessary to serve the purposes of punishment." So even if there were some error in the court's drug-quantity calculation and the resulting Guidelines range--which we doubt--we think these statements show that the court would have imposed the same sentence even under the correct range. That means that any error did not impact Stanley's substantial rights. See Reed, 830 F.3d at 8.

**CONCLUSION**

For the reasons stated we affirm the brothers' convictions and Stanley's sentence.[9]

---

[9] One more sentencing point: Stanley also argues that the district court erred in considering him a career offender under the Guidelines because he did not have "two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a)(3). Stanley himself points out that three of his convictions are career-offender predicates under the Guidelines' residual clause; his entire argument hinges on his claim that these convictions don't count because the residual clause is unconstitutionally vague. But after this case was briefed and argued, the Supreme Court found that the Guidelines' residual clause "is not void for vagueness." Beckles v. United States, 137 S. Ct. 886, 892 (2017). That means Stanley has at least three predicates, so he has not shown the sentencing court erred in considering him a career offender. Although the government conceded in its brief that the Guidelines' residual clause was unconstitutionally vague, this court is "not bound by the government's concession, which, while understandable before Beckles, turned out to be incorrect." United States v. Thompson, 851 F.3d 129, 131 (1st Cir. 2017) (affirming career-offender-predicate status of Massachusetts assault and battery with a dangerous weapon under the Guidelines' residual clause over government concession that residual clause was invalid).