# United States Court of Appeals
## For the First Circuit

No. 16-1489

UNITED STATES OF AMERICA,

Appellee,

v.

DAMIEN CORBETT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Thompson, and Barron,
Circuit Judges.

Michael C. Bourbeau, with whom Victoria M. Bonilla-Argudo and Bourbeau & Bonilla, LLP were on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Richard W. Murphy, Acting United States Attorney, was on brief, for appellee.

September 5, 2017

**THOMPSON**, **Circuit Judge**.  The defendant, Damien Corbett, raises three issues in this appeal from his conviction of conspiracy to distribute and possess with intent to distribute oxycodone and oxymorphone.  Corbett first argues that the government's evidence was insufficient.  Somewhat relatedly, he contends that the district court committed plain error in its response to a question from the jury.  Finally, he asserts that the court erred in imposing a sentencing enhancement for the use or attempted use of a minor in the commission of the offense, see U.S.S.G. § 3B1.4.  We affirm.

## BACKSTORY[1]

Back in 2014, as part of a drug-trafficking investigation in North Berwick, Maine, law-enforcement personnel orchestrated several controlled buys of oxycodone pills[2] from two dealers, Taysha Gillis, who was then eighteen years old, and Kenneth Gerrish.  On December 16, 2014, Gillis and Gerrish were arrested soon after the final controlled buy.  Police also executed a search warrant for Gillis's residence that same day and found

---

[1] Because Corbett challenges the sufficiency of the evidence, we recount the facts in the light most favorable to the government. See United States v. Ponzo, 853 F.3d 558, 566 n.1 (1st Cir. 2017).

[2] Oxycodone pills are sometimes referred to by their brand name, Percocet.

over 550 oxycodone pills, over 350 oxymorphone pills,[3] and thirty-seven Suboxone pills[4] in two safes in Gillis's bedroom closet.

Meanwhile, police questioned Gillis and Gerrish separately. Gillis quickly came clean: She removed eighty-seven oxycodone pills from her shirt and identified Corbett as her source for the pills she was peddling.[5] Armed with this knowledge, law enforcement decided to set up a meeting between Gillis and Corbett.

Now in full-cooperation mode, Gillis — wearing a wire to record the encounter and possessing $3,000 in government-supplied prerecorded buy money — met with Corbett a few days after her arrest; the ostensible purpose of this meeting was for Gillis to pay Corbett money for pills that he had "fronted" her.[6] The two met inside Corbett's car.[7] After some brief chitchat, Gillis and

---

[3] Throughout the record, the oxymorphone pills are referred to by their brand name, Opana.

[4] Although the record is silent on this point, we have previously explained that "Suboxone is a prescription medication that is used to block the effect of withdrawal from opiate addiction." United States v. Fleury, 842 F.3d 774, 777 n.1 (1st Cir. 2016).

[5] Like Gillis, Gerrish also identified Corbett as the supplier of the pills he was selling.

[6] For those not hip to drug-dealing lingo, drugs are "fronted" when a supplier gives them to a drug dealer on credit with the understanding that the dealer will pay for them once he or she is financially able to do so.

[7] When Gillis entered Corbett's car, he was listening to a talk show on the radio. Because Corbett kept the radio on for the entirety of their meeting, the recording of what was said in the car is unintelligible in some places. We piece together the

- 3 -

Corbett discussed their mutual mistrust of Javier, the then-boyfriend of Gillis's mother; Corbett had previously expressed his concern to Gillis that Javier, as a Coast Guard employee, might impede their pill-distribution scheme in some way. Because of this concern, Gillis proposed that Corbett take back some Opanas that she had been unable to sell: "I don't trust Javier either. That's why I think you should get the Opanas really soon . . . ." Corbett responded: "All right, I will. I will pick them up, uh . . . tomorrow or the day after." Following this exchange, and because Corbett was concerned that the pair's cellphones might be tapped, he suggested that Gillis put both phones in her car so that they could continue their conversation in his car. Gillis complied with this directive and then returned to Corbett's car.

Later in the conversation, Gillis asked Corbett, "What is it I owe you again?" When Corbett responded "Twenty-six fifty," Gillis pushed back, "I thought it was twenty[-]five sixty for some reason." Corbett replied: "I have to think. It might be." Gillis then offered to pay Corbett $2,560 and suggested that she had "extra in case you wanted to give me anything else." Corbett accepted the $2,560, and responded that he didn't have any oxycodone pills to sell Gillis at the moment. Corbett then told Gillis, "[T]omorrow I will come back," which she understood to

---

substance of the encounter from the intelligible portions of the recording and Gillis's trial testimony.

mean that he would pick up the Opanas the next day. After the money switched hands, Gillis told Corbett that she still had some Suboxone pills and did not want any more of those pills: "I'm gonna like keep those and continue to try to get rid of the rest of those but I don't want any more of those." Corbett responded, "Alright." The conversation eventually ended, and Gillis left Corbett's car.

At this point, multiple officers converged on the scene, and Corbett was arrested. In a search of his vehicle, police found the $2,560 in prerecorded buy money in the center console, as well as an additional $3,843 underneath the seat. When questioned by police, Corbett insisted that he and Gillis "were just talking." Police asked Corbett about the money found in his car, and he answered that it came from "a settlement";[8] he did not mention that Gillis had just paid him.

A federal grand jury indicted Corbett on one count of conspiracy to distribute and possess with intent to distribute a mixture or substance containing oxycodone and a mixture or substance containing oxymorphone, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The indictment alleged that the charged conspiracy

---

[8] At the time of the interrogation, Corbett had recently "received a sum of money" as part of an insurance settlement for a fire loss.

ran from "approximately June 2013 through and until December 16, 2014."

Both Gillis and Gerrish, among others, testified at Corbett's trial.[9] Gillis told the jury about the evolution of her relationship with Corbett. She first came in contact with Corbett through Facebook when she was thirteen years old. After "[m]aybe a month or a couple of months" of communicating through Facebook, the two met in person at the home of Gillis's friend. On that occasion, Corbett gave Gillis some money and asked her "to get him weed." Gillis left and did as Corbett instructed, but when she returned with the goods, Corbett had already left the house; he told Gillis to keep the newly purchased merchandise for herself. Corbett and Gillis continued to occasionally see one another, typically at Gillis's home. On one of these occasions, Corbett provided the underage Gillis with alcohol.

Eventually, the relationship between Corbett and Gillis entered the realm of oxycodone trafficking. It all started when Corbett and Gillis decided to ask Gerrish if he could obtain oxycodone pills from his father and sell them to Corbett.[10] Gillis

---

[9] By that point, Gerrish had pled guilty to conspiracy to distribute oxycodone, and Gillis had pled guilty to conspiracy to distribute both oxycodone and oxymorphone.

[10] When asked "who brought up the idea," Gillis responded, "Um, both of us [i.e., Corbett and Gillis]."

asked Gerrish, and Gerrish obliged, obtaining the pills from his dad and selling them to Corbett for a profit.

After this first exchange, Corbett told Gillis that he could obtain oxycodone pills (from some unknown source who was not Gerrish's father) for $22 per pill and that she could sell them for a profit. Gillis agreed to that arrangement, and, about a month later, Corbett fronted her the first delivery of pills. Over the next two years until Gillis was arrested, Corbett continued to deliver oxycodone pills for Gillis to distribute. The frequency of the deliveries varied; sometimes they occurred on a weekly basis, and sometimes monthly drop-offs were made. Corbett continued to front Gillis pills on occasion. Gillis also testified that Corbett set the price that she paid for the pills; she once asked Corbett how many pills she'd have to purchase in order to get a cheaper price, and Corbett responded, "Too many." And Gillis never obtained a cheaper price from Corbett. In addition to oxycodone, Corbett also supplied Gillis with "Suboxone, Opanas, Dilaudid, [and other] pharmaceuticals."[11]

Gerrish also testified against Corbett. He told the jury that he agreed with Gillis to sell oxycodone pills that he would purchase from her. Gerrish also explained that he sometimes

---

[11] With respect to the oxymorphone pills in particular, about two months before Gillis was arrested, Corbett told her that she could make more profit selling oxymorphone pills than she could selling oxycodone pills.

was present when Corbett delivered pills to Gillis. On those approximately five occasions, Gerrish saw Corbett hand Gillis "[a] baggie with pills in it." On cross-examination, however, Gerrish acknowledged that, when he was interrogated by police after his arrest, he denied that he had seen any hand-to-hand exchange of pills between Corbett and Gillis. He explained, "At that time I denied a lot of things."

After the government rested its case, Corbett moved for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure, arguing that the evidence was insufficient. The district court denied the motion. In his closing argument, defense counsel attacked the credibility of both Gillis and Gerrish. Gerrish, defense counsel stressed, had testified inconsistently with what he initially told investigators about observing pill exchanges between Corbett and Gillis. Defense counsel painted Gillis as a liar who was seeking to falsely pin the blame on Corbett in the hopes of receiving leniency for her drug-dealing ways. Finally, defense counsel also emphasized that police did not find any drugs on Corbett or in his car when they arrested him.

In its final charge to the jury, the district court instructed the jury on the elements of conspiracy, and told the jurors that they should consider the testimony of the cooperating witnesses, Gillis and Gerrish, "with caution" because "[t]hey may

have had reason to make up stories or exaggerate what others did because they wanted to help themselves." At the conclusion of its instructions, the court asked counsel whether they had any objections or additions to the instructions just delivered; defense counsel responded that he did not.

During their deliberations, the jurors sent multiple notes to the judge, two of which are relevant to this appeal. The first note, which was submitted to the court approximately two-and-a-half hours after deliberations began, asked: "Can you please advise us regarding inability to reach a verdict? Both sides are adamant." The court responded, "In response to your note, I advise that you again review the evidence and my instructions and continue to deliberate." Defense counsel informed the court that he had no objection to this response.

The second note from the jurors read: "Does the intention of the defendant to pick up the drugs ([O]panas) [from Gillis's home] as evidenced in the audiotape fall within the scope of the indictment charges?" (Asterisk omitted.) After the parties initially disagreed on how to respond, the district court briefly set forth his intended response. Both before and after the court discussed its response, the judge told the parties, "I'm not wedded to this." The court proposed the following response: "In response to your note (Court Exhibit 6) and to answer your question, you need to determine if the conspiracy charged in the indictment

existed, what was the scope and purpose of that conspiracy, and if the defendant willfully joined the conspiracy based on the evidence of his own words or deeds." When the district court solicited the parties' views on its proposed response, defense counsel stated, "I think it restates the instruction already given, so I have no problem."

The jury ultimately found Corbett guilty. The presentence investigation report (PSR) recommended a two-level enhancement under U.S.S.G. § 3B1.4 for Corbett's use of a minor, Gillis, during the conspiracy. Corbett objected to this aspect of the PSR. The district court applied the enhancement, accepting the government's argument that the evidence showed that Corbett had groomed[12] Gillis to distribute drugs for him. The court sentenced Corbett to a term of 100 months of imprisonment. Corbett timely appealed.

## ANALYSIS

### A.    Sufficiency of the Evidence

We first address Corbett's argument that the evidence against him was insufficient. Because he preserved the issue by filing a motion for judgment of acquittal, our review is de novo. See United States v. Gonsalves, 859 F.3d 95, 110 (1st Cir. 2017).

---

[12] We'll discuss the district court's grooming conclusion in more detail below, see infra Part C.

- 10 -

In assessing a sufficiency-of-the-evidence claim, we view the evidence in the light most favorable to the government, draw all reasonable inferences in its favor, and ask whether a rational factfinder could have found each element of the charged offense beyond a reasonable doubt. See id. at 110-11; United States v. Rivera-Ruperto, 846 F.3d 417, 432 (1st Cir. 2017). Additionally, we "must defer all credibility judgments to the jury," Gonsalves, 859 F.3d at 111 (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)), "drawing all credibility choices in the government's favor," United States v. Morosco, 822 F.3d 1, 7 (1st Cir. 2016), and disturbing "only those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative," United States v. Serunjogi, 767 F.3d 132, 140 (1st Cir. 2014) (internal quotation marks omitted) (quoting United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000)). Given the manner in which we must view the evidence, it's no surprise (and no secret) that a sufficiency challenge is oftentimes a bit of a longshot. See Rivera-Ruperto, 846 F.3d at 432 (explaining that sufficiency claims are "rarely successful" (quoting United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993))); Morosco, 822 F.3d at 7 (explaining that "[s]ufficiency arguments seldom succeed"); United States v. Correa-Osorio, 784 F.3d 11, 26 (1st Cir. 2015) (explaining that "[s]ufficiency challenges rarely succeed"); United States v. George, 761 F.3d 42,

48 (1st Cir. 2014) (explaining that "a sufficiency challenge is a tough sell" (quoting United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011))).

The government needs to prove three elements beyond a reasonable doubt to secure a conviction for conspiracy under § 846: "(1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy." Rivera-Ruperto, 846 F.3d at 432 (quoting United States v. Maryea, 704 F.3d 55, 73 (1st Cir. 2013)). The third element requires the government to show that the defendant "intended to join the conspiracy and that he intended for its goals to be accomplished." United States v. Paz-Alvarez, 799 F.3d 12, 25 (1st Cir. 2015). Viewing the evidence in the requisite verdict-friendly manner, the government's evidence in this case was plainly sufficient.

Sufficient evidence was presented to show that the charged conspiracy existed. See Rivera-Ruperto, 846 F.3d at 432. Based on the testimony of Gillis and Gerrish, a rational juror could have concluded that an oxycodone-distribution conspiracy existed where Corbett would supply the oxycodone to Gillis, who would then sell the pills to others, including Gerrish. Additionally, Gillis testified that, about two months before her arrest, Corbett told her that she could make more of a profit

selling oxymorphone pills, Gillis "agreed to see if [she] could sell them," and she sold "1 or 2" oxymorphone pills.

The testimony of these two witnesses also amply supports the second and third elements of the charged conspiracy — that Corbett knew of the conspiracy and knowingly and voluntarily participated in it. See id. Gillis testified that Corbett was her source for the oxycodone and oxymorphone pills. And she testified that, over a two-year period, Corbett continued to deliver oxycodone pills to her on either a weekly or a monthly basis and that the average number of pills Corbett delivered each time increased during the course of the conspiracy. Gillis also told the jury that Corbett supplied her with oxymorphone pills on one occasion. Like Gillis, Gerrish told the jury about the times he witnessed Corbett delivering pills to Gillis. Finally, Gillis testified that Corbett fronted some of the pills that he delivered to her. See United States v. Bedini, 861 F.3d 10, 15 (1st Cir. 2017) (explaining that fronting drugs can constitute "an act of trust that assume[s] an ongoing enterprise with a standing objective" (quoting United States v. Ortiz-Islas, 829 F.3d 19, 25 (1st Cir. 2016))).

Corbett's knowing and voluntary participation in this conspiracy was also established by Gillis's testimony about what

transpired during the recorded conversation in the car.[13]  When Gillis asked Corbett to pick up oxymorphone pills from her, he agreed to do so.  Additionally, after a brief exchange about the precise dollar figure, Corbett accepted $2,560 from Gillis for a debt that Gillis owed him, and Gillis told the jury that this debt was for oxycodone pills that Corbett had previously fronted her.  Finally, Corbett's conduct during the conversation with Gillis betrayed a fear of being overheard while talking to her about the conspiracy; he played his car radio loudly throughout the conversation, and, worried that their cellphones might be tapped, he instructed Gillis to put the phones in her car so that they could safely talk in his car.  Cf. George, 761 F.3d at 51 (explaining, when considering evidence that defendant expressed over the phone his unwillingness to engage in illegal activity,

---

[13] Even if we accept Corbett's position that no conspiracy existed at the time of the recorded conversation because both of Corbett's coconspirators were cooperating with law enforcement, the recorded conversation (and Gillis's testimony about it) was still admissible.  See United States v. Fanfan, 468 F.3d 7, 11-12 (1st Cir. 2006) (explaining that evidence of recorded conversation between defendant and coconspirator who had, unbeknownst to defendant, been arrested and was cooperating with law enforcement at time of conversation was admissible in conspiracy prosecution); cf. Ortiz-Islas, 829 F.3d at 27 (affirming admission of evidence of post-indictment sting-drug transaction because evidence "'was closely linked in time to the alleged conspiracy and proved the identities and relationships of the conspirators'" and "evidence of the final, faux deal merely illuminated what had been going on among the relevant parties for over a year, a course of conduct that was firmly shown through overwhelming evidence including co-conspirators' testimony" (quoting United States v. Niemi, 579 F.3d 123, 128 (1st Cir. 2009))).

that "a logical jury could also conclude that [defendant] did not like talking shop over the phone and so sprinkled in words suggesting his unwillingness to do anything illegal just in case the police were listening in").

Perhaps in recognition of the testimony of these witnesses, Corbett appears to concede that, if the jury believed Gillis and Gerrish, the evidence was sufficient. But wait, he says: "The jur[ors] could not have unanimously agreed on their credibility," he tells us, "because [of] the notes to the court sent out during deliberations." Corbett appears to support this argument with the following reasoning. The first note, in which the jurors indicated that they were at an impasse in their deliberations, suggested that at least some jurors were not convinced beyond a reasonable doubt that Corbett was guilty of the charged pill-peddling conspiracy. The second note showed that the once-divided jurors were now focusing on the audio recording of the December 19 meeting with Gillis and Corbett. Weaving these two strands together, Corbett insists that the jurors must have found him guilty of a conspiracy solely based on the recorded conversation, which occurred at a time when Gillis was acting as a government agent and, therefore, could not be a conspirator as a matter of law. This line of argument, although creative, cannot carry the day.

Corbett places far more weight on the juror notes than they can reasonably bear. The second note tells us only that, when the jurors wrote the note, they were then focusing on the recorded conversation. Contrary to Corbett's position, that note in no way suggests that the jurors had rejected all of the other evidence in the case and had discredited the testimony of Gillis and Gerrish. Similarly, the first note suggests only that, when the jurors wrote that note after less than three hours of deliberations, they were not yet all on the same page with respect to Corbett's guilt or innocence. As was true for the second note, nothing in the first note suggests that the jurors in the end rejected the testimony of Gillis and Gerrish. Therefore, we reject Corbett's argument that the two juror notes demonstrate that the jury found these two witnesses to be not credible.

Perhaps as a fallback to his primary insufficiency argument, Corbett also offers discrete reasons why the testimony of both Gillis and Gerrish was, in his view, suspect. Both witnesses, he points out, began cooperating only after they had both been caught red-handed with a cache of pills. Additionally, Corbett highlights the about-face in Gerrish's story; although he initially told police that he had not observed any hand-to-hand exchange of drugs between Corbett and Gillis, he testified at trial that he had, in fact, seen such exchanges. And Gillis was no saint, either, Corbett insists. He emphasizes that, even after

Corbett was removed from the picture on account of his arrest, Gillis went right back to her drug-dealing ways, and this time heroin replaced oxycodone as the hot commodity.

Although these seeds of doubt might have stood some chance of finding fertile ground in closing argument before a jury, they have no chance of survival in the arid climate that is appellate sufficiency-of-the-evidence review. As we have explained, credibility determinations are for the jury, not this court, to make, see Gonsalves, 859 F.3d at 111, and our review must "resolve all credibility disputes in favor of the verdict," United States v. Gaw, 817 F.3d 1, 4 (1st Cir. 2016). Corbett made these credibility arguments to the jury, but the jury found him guilty nonetheless. See Gonsalves, 859 F.3d at 111 (emphasizing this point while rejecting "hopeless" witness-credibility argument). We cannot say that it was unreasonable or insupportable to credit the testimony of Gerrish and Gillis. See Serunjogi, 767 F.3d at 140.

In a last-ditch effort to stem the tide, Corbett stresses that he was never found in possession of any drugs and never expressed the intent to sell drugs in the recorded conversation with Gillis. But the government was not required to produce such smoking-gun evidence to secure Corbett's conviction. See Paz-Alvarez, 799 F.3d at 25 ("There are many ways to show that a defendant intended to join and advance a conspiracy, even where

the defendant never actually handled the drugs."). As explained above, the testimony of Gerrish and Gillis amply supported the guilty verdict. Therefore, Corbett's sufficiency challenge must fail.

### B. Court's Response to Second Juror Note

Corbett next argues that the district court erred in its response to the jurors' question about whether Corbett's expression in the recorded conversation of an intent to pick up the oxymorphone fell within the scope of the conspiracy. As Corbett sees things, the court's response incorrectly suggested to the jurors that they could consider Corbett's words or actions in his conversation with Gillis — who by then was a government agent with whom Corbett could not conspire as a matter of law — as evidence of the existence of the charged conspiracy.

Recognizing that he failed to raise the issue below, Corbett suggests that we must review this claim under the daunting plain-error standard of review. Not so fast, says the government: When defense counsel told the district court "I have no problem" with the proposed response, he affirmatively waived — rather than merely failed to preserve — this issue. We start (and end) our analysis with the question of waiver.

A litigant waives a claim when he or she "'intentionally relinquishes or abandons' a known right." United States v. Walker, 538 F.3d 21, 23 (1st Cir. 2008) (quoting United States v.

- 18 -

Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002)); see also United States v. Torres-Rosario, 658 F.3d 110, 115-16 (1st Cir. 2011). The distinction between waiver and forfeiture is critical: Although a forfeited claim will be reviewed for plain error, "a waived issue ordinarily cannot be resurrected on appeal." Walker, 538 F.3d at 23 (quoting Rodriguez, 311 F.3d at 437).

In this case, we agree with the government that Corbett waived any challenge to the district court's response to the second juror note. Before the district court responded to the note, the court twice told the parties that it was not at all "wedded" to the language proposed. Despite this clear invitation from the district court to propose alternative responses, defense counsel, when given the opportunity to voice Corbett's position, stated, "I think it restates the instruction already given, so I have no problem." (Emphasis added.)

We have explained that, "when the 'subject matter [is] unmistakably on the table, and the defense's silence is reasonably understood only as signifying agreement that there was nothing objectionable,' the issue is waived on appeal." United States v. Soto, 799 F.3d 68, 96 (1st Cir. 2015) (quoting United States v. Christi, 682 F.3d 138, 142 (1st Cir. 2012)). Here, the district court unmistakably placed the issue of how to respond to the second juror note on the table, and Corbett's counsel was not merely silent, but affirmatively stated that he had "no problem" with the

court's proposed response. This amounts to waiver. See id. (holding that challenge to district court's instruction was waived where "the district court informed [defendants] exactly how it was planning to instruct the jury . . . and sought their feedback, twice asking if they were okay with those specific instructions" and counsel for one defendant "affirmatively stated there was no objection" while counsel for other defendants "remained silent"; "[g]iven the judge's invitation to speak up with any disagreement, these reactions can only be interpreted as signifying approval with the instructions as previewed"); United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006) (holding that challenge to district court's failure to give multiple-conspiracy instruction was waived where defense counsel "not only failed to object to the court's omission of his proposed multiple conspiracy instruction, but also affirmatively stated 'I am content' after the district court instructed the jury"); id. at 105-06 (holding that challenge to district court's handling of note from juror about privacy concerns was waived because, when district court proposed a curative instruction, "defense counsel responded, 'Something along those lines, Judge, fine'").[14]  So we say no more about this issue.

_____

[14] We recognize that we can, "as a matter solely of [our] discretion," forgive waiver in "the rare case." United States v. Walker, 665 F.3d 212, 227 (1st Cir. 2011); see also Torres-Rosario, 658 F.3d at 116 ("[C]ourts may excuse waivers and disregard stipulations where justice so requires.").  Corbett has made no

## C.    Enhancement for the Use of a Minor

Corbett's final contention on appeal is that the district court erred in imposing a guideline enhancement under U.S.S.G. § 3B1.4 for Corbett's use or attempted use of a minor. Convinced that Gillis's foray into the world of drug dealing both predated her friendship with Corbett and continued after Corbett was arrested, he insists that Gillis was "predisposed to commit the offense and was not an 'unwary innocent.'"

The government must prove sentencing enhancements by a preponderance of the evidence.  Walker, 665 F.3d at 232.  We review the district court's interpretation of the meaning and scope of a sentencing guideline de novo, while the court's factfinding is reviewed for clear error, with "due deference to the court's application of the guidelines to the facts."  United States v. Vega-Rivera, No. 15-2467, 2017 WL 3276789, at *3 (1st Cir. Aug. 2, 2017); see also Walker, 665 F.3d at 232.

The guidelines call for a two-level increase in the offense level "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4 (2015).  The commentary for this enhancement provides that "'[u]sed or attempted to use' includes directing, commanding,

---

argument that this is such a case, and we see no reason to excuse his waiver.

encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." Id. cmt. n.1.

The district court appropriately applied this enhancement in this case. Before the conspiracy even began, Corbett gave Gillis, who was then about thirteen years old, some money and asked her to obtain some marijuana for him. After she did as instructed, Corbett told Gillis that she could keep the marijuana that he had paid for. On another occasion, Corbett provided alcohol to the underage Gillis. The district court supportably found that each of these instances were examples of Corbett's "long process of grooming" Gillis "to become a dealer for him." In other words, the district court found that Corbett's conduct on these occasions — which began when Gillis was a young girl — were attempts to encourage, recruit, or solicit her. See id. cmt. n.1; see also United States v. Hardy, 393 F. App'x 205, 207 (5th Cir. 2010) (per curiam) (affirming application of enhancement where defendant "cultivated a relationship with 16-year-old J.M., providing her with free methamphetamine"; minor later brought one of her friends to defendant's home to purchase methamphetamine; friend "eventually became a user and distributor of [defendant]'s methamphetamine").

In addition to grooming Gillis, the evidence shows that Corbett used Gillis as a seller in this pill-trafficking conspiracy when she was a minor. Gillis, who was eighteen years old when she

was arrested, testified that Corbett delivered large quantities of oxycodone pills to her for approximately two years prior to her arrest. See United States v. Acosta, 534 F.3d 574, 588 (7th Cir. 2008) ("Distributing drugs directly to minors for further distribution qualifies as the type of personal use of a minor warranting application of the use-of-a-minor enhancement under § 3B1.4."); cf. United States v. Mott, 26 F. App'x 8, 9-10 (1st Cir. 2001) (per curiam) (affirming application of enhancement where defendant in conspiracy case allowed minor to sell drugs out of defendant's apartment; "[defendant] was aware that [minor] was selling drugs from the apartment and agreed to it"). Moreover, notwithstanding Corbett's assertion to the contrary, this is a case where the defendant encouraged the minor's drug activity: Corbett encouraged Gillis to sell pills by fronting them to her throughout the two-year conspiracy with the understanding that she would pay him for the pills once they were sold. See United States v. Garcia, 497 F.3d 964, 971 (9th Cir. 2007) (affirming district court's application of enhancement where defendant, among other things, encouraged minor by fronting her methamphetamine to sell); United States v. Caster, 24 F. App'x 864, 867 (10th Cir. 2001) (similar); cf. Ortiz-Islas, 829 F.3d at 26 (explaining that defendant's willingness to front drugs to coconspirator shows "the importance of sustaining a regular course of business").

Corbett argues that "[t]he guideline enhancement for using or attempting to use a minor who is already engaged in the drug business and predisposed to continue in the business[] is not warranted."  We are immediately skeptical of this argument.  For starters, we see nothing in the text of the enhancement to support the troubling notion that a minor could ever be deemed to be so predisposed to criminal conduct that an adult who then encourages that conduct is not subject to the enhancement.  Instead, § 3B1.4 reaches defendants who "used or attempted to use" any "person less than eighteen years of age" — without regard to the minor's propensity to obey or disobey the criminal laws.  Additionally, none of the cases Corbett cites support his predisposition argument.  Cf. United States v. Rose, 496 F.3d 209, 214 (2d Cir. 2007) (rejecting argument that "§ 3B1.4 applies only if the minor is vulnerable, child-like in appearance, or predisposed against crime" and explaining that "[t]he fact that the minor was a large, seventeen-and-a-half year old drug dealer who participated eagerly in the [armed-robbery and kidnapping] crimes does not make § 3B1.4 inapplicable").  Finally, in addition to the lack of support in the enhancement's text or in the case law, Corbett's predisposition argument also seems inconsistent with the purpose behind the enhancement:  to protect minors.  See United States v. McClain, 252 F.3d 1279, 1286 (11th Cir. 2001) ("The unambiguous legislative design of section 3B1.4 is to protect minors as a class . . . .").

- 24 -

Reserving that protection only for law-abiding minors and withholding it from the minors who need it most would seem to frustrate that clear purpose.

But we need not definitively decide whether a minor's predisposition towards crime can ever foreclose application of the enhancement because the component parts of Corbett's predisposition argument in this case are either factually unsupported or undeveloped. As we understand it, Corbett's effort to paint Gillis as predisposed to deal drugs is based on two assertions. First, Corbett asserts that Gillis "was selling drugs before any relationship with the defendant" got underway. Second, Corbett notes that "Gillis also continued her drug use and drug sales" after Corbett was out of the picture. Each assertion is fatally flawed in the circumstances of this case.

The first assertion is factually infirm: Corbett does not point us to any evidence in this record to support his claim that Gillis was selling drugs before she met him. Perhaps Corbett intends to refer to the time when, at Corbett's direction, Gillis acquired marijuana for him with money he had given her. But Gillis's acquisition of marijuana from some unknown source is not evidence that Gillis was selling drugs before she met Corbett. Similarly, Corbett references the time when "Gillis and . . . Gerrish, with the assistance of Gerrish's father, provided oxycodone to [Corbett]." But the evidence shows only that Gillis

reached out to Gerrish to obtain the pills, that Gerrish did so, and that it was Gerrish, and not Gillis, who sold them to Corbett for a profit. Thus, this evidence similarly does not support Corbett's argument that Gillis was selling drugs before her relationship with him began. Indeed, the district court supportably found that these prior exchanges between Corbett and Gillis were evidence of Corbett recruiting and grooming Gillis to be part of his oxycodone-peddling plan.

The second assertion — that Gillis continued to use and sell drugs — suffers a flaw of Corbett's own making: He hasn't pointed us to any authority that suggests that a minor's later conduct that is unrelated to the charged offense is relevant to the inquiry of whether the enhancement is appropriate.[15] And it's not apparent to us from the plain text of the enhancement that such conduct matters one iota; the enhancement, after all, focuses on whether the defendant used or attempted to use a minor "to commit <u>the offense</u> or assist in avoiding detection of, or

---

[15] The only case Corbett cites is a Supreme Court case that discusses predisposition in the context of the defense of entrapment. <u>See</u> <u>United States</u> v. <u>Russell</u>, 411 U.S. 423, 428-36 (1973). But he makes no effort to explain why the principles of this entrapment case — which was decided more than twenty years before the enhancement became effective, <u>see</u> U.S.S.G. § 3B1.4, cmt. hist. n. (indicating that enhancement first became effective in 1995) — should have any bearing on the issue before us, and "[d]eveloping a sustained argument out of . . . legal precedents is the job of the appellant, not the reviewing court, as we have previously warned." <u>Town of Norwood</u> v. <u>Fed. Energy Regulatory Comm'n</u>, 202 F.3d 392, 405 (1st Cir. 2000).

apprehension for, the offense." U.S.S.G. § 3B1.4 (2015) (emphases added). In any event, given Corbett's failure to meaningfully develop this argument or support it with any authority, we need not definitively decide this point. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Undeterred, Corbett takes another tack at avoiding the enhancement: Emphasizing that Gillis sold the pills "on her own at a profit," Corbett argues that Corbett and Gillis were, at best, partners in this pill-peddling enterprise. And, citing a pair of out-of-circuit cases, he insists that the enhancement requires "something more than a 'partner' type relationship" like what we have here. (Citing United States v. Parker, 241 F.3d 1114 (9th Cir. 2001); United States v. Butler, 207 F.3d 839 (6th Cir. 2000).) We are unpersuaded.

Unlike Parker and Butler, this is not a case where the minor was an equal partner of the defendant. See Parker, 241 F.3d at 1120-21 (finding enhancement inapplicable where there was no evidence "that the defendant acted affirmatively to involve the minor in the [bank] robbery, beyond merely acting as his partner"); Butler, 207 F.3d at 849 & n.3 (finding enhancement inapplicable where "[t]he facts, at best, show only that [twenty-year-old defendant] and [seventeen-year-old minor] possessed equal

authority in their commission of the [bank robbery]").[16]  Corbett, as Gillis testified, was her sole supplier of oxycodone pills. See Acosta, 534 F.3d at 588.  Gillis had no say in the price that she paid for the pills; Corbett set the price at $22 per pill. Additionally, he fronted her pills on multiple occasions, encouraging her to accept pills she "could not pay for" with the understanding that she would "pay for [them] the next time."  In short, the record belies Corbett's characterization of his relationship with Gillis as an equal partnership.

We therefore reject Corbett's challenge to the district court's application of the use-of-a-minor enhancement.

## CONCLUSION

For these reasons, we affirm Corbett's conviction and sentence.

---

[16] We note that there's a circuit split on whether the enhancement must be based on a defendant's own affirmative actions or whether it can be applied based on a coconspirator's reasonably foreseeable use of a minor, see United States v. Acosta, 474 F.3d 999, 1002 (7th Cir. 2007) (collecting cases), and that this court has already weighed in on this debate, see United States v. Patrick, 248 F.3d 11, 27-28 (1st Cir. 2001) (holding that, in conspiracy case, defendant's "sentence could be enhanced based on his co-conspirator's reasonably foreseeable use of juveniles to further the [organization]'s activities").  We need not concern ourselves with this nuance, however, because the question of the enhancement's applicability on these facts concerns only Corbett's actions.