# United States Court of Appeals
## For the First Circuit

No. 17-1123

UNITED STATES OF AMERICA,

Appellee,

v.

RANDY CHARRIEZ-ROLÓN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Alan Jay Black, for appellant.
Christopher J. Smith, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Franscisco A. Besosa-Martínez, Assistant United States Attorney, were on brief, for appellee.

May 1, 2019

**THOMPSON**, **Circuit Judge**.    Randy Charriez-Rolón (Charriez, for short) stands convicted of possessing child pornography and transporting a minor with the intent to engage in criminal sexual activity.  For his crimes, he received an effective sentence of 420 months in prison (because the district judge ordered concurrent time).  Charriez now appeals, arguing that there was insufficient evidence to convict him of possessing child pornography and that the prosecutor's comments during closing arguments crossed constitutional lines.  Neither of his arguments persuade us, so we **affirm** his conviction on all counts.

## BACKGROUND

Because Charriez challenges the sufficiency of the evidence, among other things, we state the facts in the light most favorable to the jury's verdict.  See United States v. Santos-Soto, 799 F.3d 49, 56-57 (1st Cir. 2015).

### A.   XFS Moves In[1]

In 2009, when he was five years old, XFS and his family moved into a neighborhood called "Las Cuchillas" in Toa Alta, Puerto Rico — four houses away from Charriez.  There, XFS lived with his parents and four siblings: two older sisters, one older brother, and one younger sister.  About a year after XFS and his

---

[1] In cases involving minors, we refer to children by their initials, rather than their full names, to protect their privacy.

family moved in, Charriez approached XFS's mother and offered a helping hand for whatever the family might need in the future.

The family welcomed the help, and Charriez began regularly spending time at XFS's home as a friendship developed. Charriez offered neighborly gestures, for instance when XFS's parents could not pick up the kids from school, Charriez would get them home. When he ran errands, Charriez would visit the kids and take them along for the ride. He got close to them, particularly with XFS.

And XFS, who was bullied at school and had trouble communicating with others, welcomed Charriez's invitations at first. After all, Charriez was showering him and his siblings with gifts such as ice cream, video games, bicycles, and even a bunk bed worth $1,000 for the boys. Unfortunately, though, things are not always as they seem, and XFS's view of Charriez quickly changed — with good reason, as we are about to see.

### B. Charriez's Sexual Abuse of XFS

In the fall of 2013, XFS was starting the third grade and doing well. That December, though, XFS's mother learned that his grades were slipping, and so she asked him what was going on. He told her that he just couldn't think. By February, XFS was failing every class. Eventually, XFS spoke with his uncle and revealed a horrifying secret about Charriez.

Turns out, Charriez's intentions were anything but pure. After picking up the kids from school, Charriez would drop them all off at home — all, that is, except for XFS, who Charriez would spend more time with without the parents' permission. Strangely, too, at night Charriez would climb up a balcony to get into the children's bedroom.

But that was only the beginning. Charriez began showing XFS "bad things" on his cellphone (more on that later). And his gifts now came with conditions. For example, if XFS wanted to ride the bike Charriez bought him, XFS had to let Charriez put his finger into XFS's anus. Once, when XFS refused, Charriez shot him in the knee with a pellet gun, tied him up, and sexually assaulted him. Charriez used Vaseline each time to facilitate the assaults.

And to Charriez, location did not matter. He would assault XFS in restroom facilities at public parks and fast food restaurants. In his vehicle with tinted windows, he would drive to isolated areas of public parking lots and assault XFS in the passenger's seat. The abuse began in late 2013 and continued until law enforcement got involved the following spring.

## C. Charriez Gets Arrested

The month after XFS spoke up about the abuses, police arrested Charriez. Waiving his Miranda rights[2] Charriez gave

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

police permission to search his home, vehicle, and cellphone while they interviewed him at the local station. At his home, police found a jar of Vaseline. In his car, they found a pellet gun under the driver's seat. On his phone, they found what appeared to be seven sexually explicit images involving minors (children under the age of eighteen).

When questioned by police, Charriez admitted to having a "curiosity" for children, which he blamed on allegedly being molested as a child. He also said he would use his cellphone to search the internet, using terms in Google like "youngsters," "pornography," "anal sex," and "pedophilia." And he said he knew child pornography involved minors around age 14 and would "download adult and child pornography," watch it, and then erase it.

Armed with these facts, a grand jury indicted Charriez for possessing child pornography and transporting a minor with the intent to engage in criminal sexual activity. See 18 U.S.C. §§ 2423(a), 2252A(a)(5)(B) and (b)(2). He pled not guilty and went to trial.

### D. The Trial

Covering only the highlights, we note that the government's case against Charriez included:

- physical evidence — the pellet gun and the tub of Vaseline;

- documentary evidence — account statements for the bunk bed Charriez purchased for XFS;

- 5 -

- photographic evidence — the images found on Charriez's cellphone; and

- testimony from police officers — about the incriminating statements made by Charriez; a computer Forensic Examiner — about finding and flagging the pornographic images on Charriez's cellphone; XFS's school social worker — about XFS's school life during the abuse; XFS's mother — about how Charriez got close to XFS; and XFS himself — about every time Charriez abused him.

All of this matched the government's theory of Charriez's crimes.

## 1. Charriez's Judgment of Acquittal Motion

At the end of the government's case, Charriez's attorney orally moved for a judgment of acquittal on the possessing child pornography charge. See Fed. R. Crim. P. 29. His sole argument was that no reasonable jury could find that the images involved minors. In his own words (emphasis ours):

> [W]hat is the evidence to conclude if those people are in fact minors? And . . . they don't have to be pediatrician[s] or anything like that, but I still think that . . . reasonable [jurors] cannot, beyond a reasonable doubt, understand that first he downloaded those images and that those are minors. <u>That is my position, Your Honor.</u>

Insisting that Charriez's argument is a question for the jury to determine, the prosecutor argued that the jurors had sufficient evidence to decide whether the images Charriez possessed depicted minors given his incriminating statements to police, the Examiner's testimony, and the images themselves. The judge agreed and denied the motion.

## 2. Charriez Takes the Stand

Against his attorney's advice, Charriez chose to testify in his defense. We again hit the highlights.

On direct examination, Charriez testified that he had albinism, a genetic condition that affected his skin and eyesight.[3] Because of his albinism, he had very dry skin and needed Vaseline to moisturize. His car had tinted windows to protect his sensitive skin and eyes from direct sunlight, the hope being that he would avoid skin cancer (or so he said). He claimed that his albinism so affected his vision that any pictures on his phone would look "blurry." Switching subjects, he discussed his relationship with XFS's mother. She and he, he said, were no longer friends, because he once called the police on her for hitting her oldest daughter — something that ticked her off. Then, he claimed that XFS's mother would regularly access his (Charriez's) cellphone, using it to "search the internet" — though he "[did]n't know what she was looking for."

On cross-examination, the prosecutor asked Charriez to confront both his admissions to police and the charges against

---

[3] According to a leading medical dictionary, albinism is "[a] group of inherited . . . disorders with deficiency or absence of pigment in the skin, hair, and eyes, or eyes only, resulting from an abnormality in melanin production." Albinism Definition, *Stedman's Medical Dictionary* (28th ed. 2006), *available at* Westlaw.

him.  Charriez admitted he told police he would search Google for terms like "pornography," "anal sex," "pedophilia," and "youngsters."  But he explained he only said so because he thought that was what police wanted to hear.  Every time the prosecutor brought up the abuse, though, Charriez's attorney objected that the questions were outside the scope of direct examination.  The judge agreed.  Unable to get Charriez to directly accept or deny responsibility, the prosecutor quickly ended his cross.

Charriez did not call any other witnesses, but he did renew his acquittal motion, making the same arguments that he had made in his previous motion.  The judge denied the renewed motion for the same reasons as before.

### 3. Summation

Each side then gave closing arguments, with the prosecutor asking the jury to convict and the defense urging the jury to acquit.  Of particular note, during the rebuttal portion of his closing argument, the prosecutor took one last shot at Charriez:

> In conclusion ladies and gentlemen and most important, the defendant came before you, took the stand and did not deny the allegations.  Had the opportunity to and when given the opportunity to he did not deny the charges.

Charriez's attorney did not object.

## 4. Jury Instructions

The next day, just before she gave the final charge to the jury, the judge talked to counsel about one instruction that she had written up on her own — an instruction that read:

[K]eep in mind that the defendant has a Constitutional right to be presumed innocent and not to testify. Actually when a defendant does not testify no inference of guilt may be drawn from the fact that the defendant did not testify.

In this case the defendant Charriez Rolon decided to testify. He provided testimony on certain subjects upon which questions which were posed to him.

Regardless of what might have been argued by counsel, I instruct you that you should examine and evaluate his testimony, that is what he said, what he testified about, and you are not to speculate or draw any adverse inference on matters that he did not testify about. The defendant['] testimony is to be evaluated just as you would evaluate the testimony of any witness with an interest in the outcome of the case.

Both sides basically agreed to the instruction, though the prosecutor proposed the following tweak:

Your Honor, there is no objection [to the jury instructions] as such, but you have given me much food for thought with respect to your handwritten instruction here. I am wondering if it might not make sense even to make it stronger, perhaps mentioning directly, statements made by counsel for the government or something along those lines. So that it becomes even more [evident] that this is curative instruction to anything that happened in the closing argument.

The judge responded (emphasis ours):

[I]t is a curative instruction, a cautionary instruction for the jury. And for the record what I am referring to is that this is an instruction that is submitted to the jury because of the government['] comments during

- 9 -

rebuttal, that the jury was to consider, or could consider that the defendant while taking the stand did not deny the conduct in Counts 1 and 2. Actually what it reads, in one of the sections is "Regardless of what may have been argued by counsel", <u>I can add what might have been argued by counsel for the government</u>. So that will pinpoint the attorney making the statement. But I don't want to unduly call the attention to a subject that otherwise could or could not have been ignored. I don't know. Any concerns by the defense?

Defense counsel said no and thanked the judge "very much." The prosecutor signed off. And that was that.

The judge issued the edited curative instruction, along with the other agreed-on instructions. And after she gave both parties the chance to object, which neither side chose to do, the jury deliberated. That same day, the jury found Charriez guilty on all counts.

## ISSUES AND ANALYSIS

Charriez now appeals, making two main arguments: first that the government did not present enough evidence for the jury to convict him of possessing child pornography, and second that the prosecutor's closing arguments violated his constitutional rights by spotlighting his decision to limit his testimony and not address his guilt or innocence. We consider each in turn.

## A. Sufficiency of the Child Pornography Evidence[4]

To convict Charriez of possessing child pornography, the government needed to prove beyond a reasonable doubt that he possessed photos that (1) contained minors who were (2) visually depicted as being engaged in sexually explicit conduct. See 18 U.S.C. § 2252(a)(2). A "minor" is a "person under the age of eighteen." Id. § 2256(1). And "sexually explicit conduct" includes "lascivious exhibition of the anus, genitals, or pubic area." Id. § 2256(2)(B)(iii).

In moving for acquittal below, Charriez argued only that the government did not adequately prove the first part of the possessing-child-pornography charge: that he possessed images of minors. And he makes that argument here, too. But he also argues for the first time that the government failed to provide sufficient evidence to prove the second part: that the pictures were "lascivious." Because he preserved his first sufficiency challenge, we review it with fresh eyes ("*de novo*" review in legalese), analyzing the evidence in the light most favorable to the government and reversing only if he carries the "heavy burden" of "show[ing] that no rational jury could have found him guilty beyond a reasonable doubt." United States v. Scharon, 187 F.3d

---

[4] Curiously, unlike the jury and us, Charriez's appellate counsel has not looked at the photos.

- 11 -

17, 21 (1st Cir. 1999) (citing United States v. Rodríguez, 162 F.3d 135, 141 (1st Cir. 1998)). But because he did not preserve his second challenge, our review is limited to preventing a "clear and gross injustice," United States v. Ponzo, 853 F.3d 558, 580 (1st Cir. 2017), knowing there can be no "clear and gross injustice" unless there has been such an "egregious misapplication of legal principles" that reversal is required, United States v. Greenleaf, 692 F.2d 182, 186 (1st Cir. 1982).

### 1.  The Ages of the Persons in the Photos

Relying on a Fifth Circuit opinion, United States v. Katz, 178 F.3d 368 (5th Cir. 1999), Charriez writes that juries sometimes need "expert testimony" to figure out the age of a model in a child-pornography prosecution. And he thinks that is the case here, because even the Forensic Examiner was not absolutely sure of the age of the persons depicted in the photos. The government disagrees, insisting that the jury needed no expert testimony because the images clearly showed *pre*pubescent children under age 18. Reviewing *de novo*, we uphold the judge's ruling.

The out-of-circuit case Charriez relies on — Katz — hurts rather than helps his cause. Yes, Katz says that expert testimony "may well be necessary" if the government is trying to prove a *post*pubescent model is under 18. Id. at 373. But — and it is a big "but" — Katz also says that such testimony "is not necessary or helpful" if images involve "*pre*pubescent children who are . . .

- 12 -

obviously less than 18." Id. at 373 (emphasis added). And Charriez does not counter the government's point that the at-issue images involve *pre*pubescent children (he filed no reply brief). So under the caselaw he favors, no expert was needed.

Turning to our own caselaw, we have no opinion directly on point. As the government notes, one case does address whether a sentencer needs an expert's help to make a finding that a postpubescent female in a video was under 18. United States v. Batchu, 724 F.3d 1, 8 (1st Cir. 2013). In answering no, however, Batchu said that "even in assessing the more technical subject of whether a sexually explicit image depicts a real or computer-generated child," we do not demand that the government provide "expert evidence on the ultimate question." Id. "[T]hat we do not require experts for that fairly technical determination," Batchu added, "suggests that we should similarly not require the government to provide an expert witness for an assessment frequently and routinely made in day-to-day experience." Id. (citing United States v. Rodriguez-Pacheco, 475 F.3d 434, 441-44 (1st Cir. 2007)). And for support, Batchu approvingly cited United States v. Cameron, a district court case holding that a factfinder could find that a person in an image "is less than eighteen years old" without any "confirming expert testimony." See 762 F. Supp. 2d 152, 163-64 (D. Me. 2011) (noting that "Rodriguez-Pacheco's logic is readily extended to the more commonsense determination of

whether a person in an image is less than eighteen years old"), aff'd in part, rev'd in part on other grounds, 699 F.3d 621 (1st Cir. 2012).  So Batchu does nothing to help Charriez's claim that expert testimony was needed here.

True, Batchu left open "whether expert testimony is required (or able) to prove beyond a reasonable doubt the minority" of certain persons in a video or photo.  See 724 F.3d at 8.  But we need not pursue that issue here, for a simple reason.  Not only did the jury hear the Forensic Examiner talk about the prepubescent children's "small" and underdeveloped bodies; and not only did the jury get to see the photos of these persons for itself — the jury also heard the police say how Charriez said that he knew child pornography involved children around 14 years old and that he searched for such images on his phone using terms like "pornography," "anal sex," "youngsters," and "pedophilia."  With this evidence — viewed afresh, and in the light most agreeable to the government — a rational jury could find, beyond a reasonable doubt, that the images admitted into evidence contained minors.

So Charriez's first sufficiency challenge fails.

### 2.  The Lasciviousness of the Photos

Charriez next argues that the photos cannot be considered child pornography because the government failed to provide enough evidence for the jury to find them "lascivious." He again blasts the Forensic Examiner's testimony, claiming that

- 14 -

because the Examiner never indicated that the images focused on the genitals, pubic area, or intended to elicit a sexual response in the viewer, the government failed to meet its burden. The government thinks otherwise, arguing again that the images are blatantly lascivious. Checking only for a clear and gross injustice, we see no reason to disturb the judge's ruling.

The problem for Charriez is that his brief does not mention the clear and gross injustice standard, let alone develop any argument to meet it. And because we are not obliged to do a party's work for him, we consider this aspect of his sufficiency claim waived for inadequate briefing. See United States v. Freitas, 904 F.3d 11, 23 (1st Cir. 2018) (finding waiver in a similar situation).

Even if we were willing to overlook this waiver — and we are not — Charriez's lascivious argument cannot prevail. "[L]ascivious is a 'commonsensical' term" and "there is no exclusive list of factors . . . that must be met for an image (or a film) to be 'lascivious.'" United States v. Silva, 794 F.3d 173, 181 (1st Cir. 2015). There are certain factors that we have considered relevant, though, including

> (1) whether the genitals or pubic area are the focal point of the image; (2) whether the setting of the image is sexually suggestive (i.e., a location generally associated with sexual activity); (3) whether the child is depicted in an unnatural pose or inappropriate attire considering her [or his] age; (4) whether the child is fully or partially clothed, or nude; (5) whether the

- 15 -

image suggests sexual coyness or willingness to engage in sexual activity; and (6) whether the image is intended or designed to elicit a sexual response in the viewer.

United States v. Amirault, 173 F.3d 28, 31 (1st Cir. 1999). Here, the contested images contained fully nude minors engaged in various sexual acts. When images, like the ones on Charriez's cell phone, show "young [children] almost always . . . fully nude" and engaging in activities that "display[] their genitalia in a manner that . . . a jury reasonably could deem to be intended to sexually arouse the viewer[,]" that is enough to show that the images are "lascivious."[5]  See Silva, 794 F.3d at 181.

So Charriez's second sufficiency argument fails, too.

## B.  The Prosecutor's Closing Comments

Which brings us to Charriez's argument that the prosecutor's comments during summation were so improper and prejudicial as to require us to grant him a new trial.[6]  The government counters that Charriez waived this argument by

_____

[5] To the extent Charriez also questions the sufficiency of lascivious evidence for lack of expert testimony on that point, the argument is a no-go. See United States v. Frabizio, 459 F.3d 80, 85 & n.8 (1st Cir. 2006) (stressing that "whether a given depiction is lascivious is a question of fact for the jury," so "expert testimony is not required").

[6] As a reminder, the prosecutor's comments at issue were:

In conclusion ladies and gentlemen and most important, the defendant came before you, took the stand and did not deny the allegations. Had the opportunity to and when given the opportunity to he did not deny the charges.

accepting a curative jury instruction and then failing to object before jury deliberations. Even if the argument is not waived, however, the government insists that the jury could reasonably infer that if Charriez could truthfully deny or explain the evidence against him, he would have. For our part, we think the government's waiver argument is a winning one.

Remember, Charriez's counsel readily agreed that the judge adequately cured any error in the prosecutor's comments by telling the jurors that "[r]egardless of what might have been argued by counsel for the government, . . . you . . . are not to speculate or draw any adverse inference on matters that [Charriez] did not testify about." His lawyer, don't forget, thanked the judge for adopting the prosecutor's suggested tweak (which prompted the judge to add the "[r]egardless of what might have been argued by counsel for the government") — a tweak that worked in his client's favor, for sure. That is waiver, pure and simple. See, e.g., United States v. Corbett, 870 F.3d 21, 30-31 (1st Cir. 2017). We can, in our discretion, excuse such a waiver if justice demands it. See id. at 31 n.14. But such cases are rare. Id. And Charriez has done nothing to convince us that this is one of them.

Enough said about the prosecutor's closing comments issue.

## CLOSING WORDS

For the reasons recorded above, we **_affirm_** the judgment of conviction entered below.